# ATTACHMENT C

# TO BOSWELL

# DECLARATION

# PART 1



THE SECRETARY OF THE INTERIOR

WASHINGTON

DEC 1 1 1996

Honorable John McCain
Chairman, Committee on Indian Affairs
United States Senate
Washington, D.C. 20510

Dear Mr. Chairman:

I am pleased to transmit to Congress the Department of the Interior's Proposed Legislative
Options in Response to the Tribal Trust Fund Reconciliation Project Results. This submission is
made as required by Section 304 of the Indian Trust Funds Management Reform Act of 1994 (25
U.S.C. § 4044), which provides that the Secretary shall outline efforts he will undertake to
resolve disputed Tribal trust fund account balances.

This report marks a milestone in the Federal Government's efforts to address longstanding
inadequacies in the management of Tribal trust accounts. Having completed a five-year study of
Tribal account transactions for the period 1972-1992, we now turn to the task of working in
collaboration with Congress and the Tribes to address what to do about our findings. As our
report indicates, we believe a legislative settlement is the most effective, expeditious, economical
and equitable way to go. While this report begins to define our views on what form that
legislation might take, we have more work to do. We will be consulting with Tribes in the
weeks to come to solicit their views on various settlement options, particularly with respect to
claims based on the unreconciled transactions and claims that may arise outside the time period
and scope of the 20-year reconciliation period. We plan to submit our final recommendations in
April 1997.

The issues that Congress, the Tribes and the Administration must confront in constructing a
settlement are not easy; there are no clear answers. Our overriding objective for this settlement
process must be to achieve fairness, recognizing the limitations of what has occurred in the past.
Our efforts must be principled and undertaken in good faith, paying those to whom money is
owed with due regard to our fiduciary obligation, while protecting the taxpayers where little or
no reasonable likelihood of actual loss exists.

The Office of Management and Budget advises that there is no objection to the presentation of
this report from the standpoint of the Administration's program.

We look forward to working with you in developing this settlement proposal. An identical letter
is being sent to Congressman Don Young.

Sincerely

cc:   Honorable Daniel Inouye, Ranking Minority Member
      Honorable Ben Nighthorse Campbell, Chairman-elect

0546



THE SECRETARY OF THE INTERIOR

WASHINGTON

DEC 11 1996

Honorable Don Young
Chairman, Committee on Resources
House of Representatives
Washington, D.C.  20515

Dear Mr. Chairman:

I am pleased to transmit to Congress the Department of the Interior's Proposed Legislative Options in Response to the Tribal Trust Fund Reconciliation Project Results. This submission is made as required by Section 304 of the Indian Trust Funds Management Reform Act of 1994 (25 U.S.C. § 4044), which provides that the Secretary shall outline efforts he will undertake to resolve disputed Tribal trust fund account balances.

This report marks a milestone in the Federal Government's efforts to address longstanding inadequacies in the management of Tribal trust accounts. Having completed a five-year study of Tribal account transactions for the period 1972-1992, we now turn to the task of working in collaboration with Congress and the Tribes to address what to do about our findings. As our report indicates, we believe a legislative settlement is the most effective, expeditious, economical and equitable way to go. While this report begins to define our views on what form that legislation might take, we have more work to do. We will be consulting with Tribes in the weeks to come to solicit their views on various settlement options, particularly with respect to claims based on the unreconciled transactions and claims that may arise outside the time period and scope of the 20-year reconciliation period. We plan to submit our final recommendations in April 1997.

The issues that Congress, the Tribes and the Administration must confront in constructing a settlement are not easy; there are no clear answers. Our overriding objective for this settlement process must be to achieve fairness, recognizing the limitations of what has occurred in the past. Our efforts must be principled and undertaken in good faith, paying those to whom money is owed with due regard to our fiduciary obligation, while protecting the taxpayers where little or no reasonable likelihood of actual loss exists.

The Office of Management and Budget advises that there is no objection to the presentation of this report from the standpoint of the Administration's program.

We look forward to working with you in developing this settlement proposal. An identical letter is being sent to Senator John McCain.

Sincerely,

cc:    Honorable George Miller, Ranking Minority Member



## United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, D.C. 20240

DEC 1 1 1996

Dear Tribal Leader:

Enclosed you will find a document entitled "Proposed Legislative Options in Response to Tribal Trust Fund Reconciliation Project Results" (Options Paper), which the Department submitted to the U.S. Congress today. The Department prepared the Options Paper in response to Section 304 of the American Indian Trust Fund Management Reform Act of 1994, which directs the Secretary of the Interior to provide Congress with a report describing the Tribal trust fund reconciliation and a statement outlining efforts the Secretary will undertake to resolve disputes regarding Tribal trust fund account balances arising from the reconciliation.

Considering the number of disputed account balances, the high cost of litigation, and our desire to resolve any disputes efficiently and fairly, we believe that a legislative resolution of tribal trust fund disputes is in the best interest of all parties. The Options Paper proposes specific approaches to correct accounts where the reconciliation project identified specific errors. For other claims, namely, claims arising from unreconciled transactions (transactions where BIA could not locate supporting documentation in the reconciliation) and claims outside the scope and time frame of the project, the Options Paper discusses concepts for possible resolution, but does not make any specific recommendations. For these claims, we seek the Tribes' ideas before we make any proposals to Congress about how to resolve them.

Because of the complexity of the problem and potential solutions, as well as the potential impact that any proposed solutions may have on the Tribes, we are providing the Options Paper to all Tribes, not only Tribes that have been identified as Trust Account Holders. The Executive Summary provides a good overview of the issues, but we ask that you carefully review the entire Paper. We ask that you provide us with your comments on the concepts discussed in the Options Paper and the attachment, which contains the Special Trustee's Advisory Board's proposals, as well as any other ideas you may have for resolving all disputes involving Tribal trust fund account balances. Please submit three copies of your written comments to: Tribal Trust Fund Comments, U.S. Department of the Interior, Bureau of Indian Affairs, Public Information Office, Attn: Ralph Gonzales, Room 4546, M.S. MIB-4542, 1849 C Street, N.W., Washington, D.C. 20240, **on or before February 12, 1996.**

We also will be convening three regional consultation meetings in the coming month, in Portland, OR; Phoenix, AZ; and Denver, CO, to obtain Tribal input on resolution of Tribal trust fund claims. In addition, we will convene a meeting in Washington, D.C., to provide a further opportunity to consult with you. We will provide additional information on these consultation meetings as soon as it becomes available.

The Department wants to develop an overall solution that will resolve Tribal trust fund disputes fairly and efficiently. Your participation in this consultation process is vital to achieving that end. We will review and consider your comments in the process of developing more specific recommendations, and intend to submit them in a follow-up report to Congress in April 1997. Your participation is greatly appreciated.

Sincerely,

Ada E. Deer

Ada E. Deer
Assistant Secretary - Indian Affairs

# NEWS

## U.S. DEPARTMENT OF THE INTERIOR

**OFFICE OF THE SECRETARY**

**FOR IMMEDIATE RELEASE**
December 11, 1996

Contact Thomas W. Sweeney (202) 219-4150
Stephanie Hanna (202) 208-3171

## INTERIOR DEPARTMENT RECOMMENDS LEGISLATIVE OPTIONS TO RESOLVE TRIBAL TRUST FUND BALANCE DISPUTES

The Department of the Interior has presented to Congress an initial report that outlines proposed legislative settlement options for resolving disputed balances in Tribal trust accounts. The report and recommendations are in response to a five-year study by a national accounting firm which examined billions of dollars in Tribal trust funds transactions handled by the Bureau of Indian Affairs for a 20-year period beginning in 1972.

"We are committed to resolving these issues in a manner that is fair to the Tribes and fair to the public, and that does justice," said Secretary of the Interior Bruce Babbitt. "Where the government has been found to owe money, we will pay it, with interest."

Where the BIA was found to have made errors to the detriment of a Tribe, the Department proposes that funds be restored to the Tribe, with interest. Where a Tribe may owe the government money after netting all errors relating to that Tribe's account, the amount would be forgiven. For claims where a Tribe disputes a transaction based on the Tribe's own documentation, or for claims where a Tribe disputes the BIA's documentation used to reconcile a transaction, those claims would be addressed through mediation.

The overriding objective of these proposed legislative settlement options is to achieve fairness and justice with respect to Tribal trust account balances. The Interior Department was guided by the following objectives in formulating its legislative proposals:

- achieve a settlement that is fair

- achieve the most resource-efficient settlement of claims (in terms of conserving federal government and Tribal time, money, and staff, including attorneys' and expert witness fees)

- encourage settlement by providing incentives to settle and by providing disincentives to litigation

-more-

- use the most informal settlement processes available rather than litigation to encourage Tribal participation

- obtain funding for the settlement without reducing appropriations for the BIA budget and Tribal programs

- achieve final agreement on account balances through September 30, 1995 as required in the Act, as an agreed-upon starting point for the future

The study, which was completed in 1995 and undertaken for the BIA and by the national accounting firm Arthur Andersen, LLP, determined that 86 percent - or $15.3 billion - of the $17.7 billion the BIA handled in Tribal trust funds non-investment transactions from July 1972 to September 1992 could be reconciled, i.e., supporting documents could be located. Of the reconciled transactions, Arthur Andersen detected an error rate of only .01%. Other components of the project assessed the accuracy of other transactions, the reasonableness of investments, and the propriety of income collected. Overall, slightly less than half of the errors detected were to the detriment of the Tribes and the balance were to the benefit of the Tribes.

There were also transactions in the amount of $2.4 billion that could not be reconciled, meaning that during the course of the study, the BIA was not able to locate documentation to support the accuracy of the transaction as reflected in the BIA's books (known as the general ledger). The report indicates that with respect to three quarters of this amount, there is relatively little risk that a Tribe did not have use of its own money (although the funds conceivably could have been credited to the wrong account of that Tribe). As a result, settlement options with regard to the unreconciled transactions will focus on the remaining $575 million in transactions. Options to address these transactions, as well as any other claims that Tribes may have involving transactions outside the scope of the 20-year study, will be the focus of consultation efforts by the Department with the Tribes.

The Interior Department report was submitted by Secretary Babbitt to the Senate Committee on Indian Affairs and the House Committee on Natural Resources. The Department will be consulting with Tribes on the options contained in the report, including meetings in January in Portland, Oregon; Denver, Colorado; Phoenix, Arizona; and Washington, D.C. It will submit further proposals to Congress for settling Tribal trust fund account balances in April 1997. In addition, early next spring, the Special Trustee, appointed by the President to reform the Department's trust funds management systems, will submit his strategic plan to the Secretary and Congress for bringing the trust accounting and management functions up to industry standards.

-DOI-

News releases may be downloaded from the DOI Homepage at URL http://www.usgs.gov/doi/bia

Attachment C Part 1 to Boswell Declaration

# PROPOSED LEGISLATIVE OPTIONS IN RESPONSE TO TRIBAL TRUST FUND RECONCILIATION PROJECT RESULTS

## I. EXECUTIVE SUMMARY

For more than a century, the federal government has been the trustee of funds for Indian Tribes and individual Indians. Currently, the Secretary of the Interior, through the Office of the Special Trustee (OST), maintains approximately 1,500 accounts for 280 Tribes with assets in excess of $2.5 billion. Each year, more than $802 million passes through the Tribal trust funds system. In addition, the Secretary, through the OST, maintains over 300,000 individual Indian money (IIM) trust fund accounts with a current balance of $450 million. Each year, $300 million passes through the IIM system.

Concerns have been expressed for a number of years in Indian country, various quarters of the Executive branch, the General Accounting Office and Congress that the trust funds management and accounting systems have not kept pace with technological developments in the private sector. Questions have been raised about whether assets were being properly managed and funds accounted for. There have been calls for accountings of both Tribal and IIM funds and for additional investment by the federal government to upgrade its systems.

In response to these concerns and the direction of Congress, the Department contracted with Arthur Andersen, LLP to perform a reconciliation of the Tribal trust fund accounts. The five-year project covered transactions for the twenty-year period from 1972 to 1992, and cost $21 million to complete. The objective of the project was to reconstruct tribal accounts to the extent possible, to provide some assurance of the accuracy of transactions, reasonableness of investment earnings, and propriety of income collected. The results of the reconciliation project and the Department's approach to developing a settlement of disputed account balances are described in more detail below. In brief, the basic reconciliation portion of the project examined $17.7 billion in non-investment transactions, of which $15.3 billion -- about 86 percent -- were reconciled. For the reconciled transactions, approximately $1.87 million in transactions were in error -- an error rate of .01 percent.

The remaining 14 percent of transactions -- amounting to $2.4 billion --

were deemed by Arthur Andersen to be "unreconciled," meaning that the Office of Trust Funds Management (OTFM) was unable to locate source documents to verify the accuracy of the general ledger entry for the transactions. For example, the general ledger might list a receipt of $1,000 to a Tribal account in connection with a mineral lease of trust property; however the underlying documentation necessary to verify its accuracy could not be located with the time and resources available. While this does not mean that the $2.4 billion is lost or missing, it does mean that the poor condition of the records and systems did not allow the federal government to conduct an audit or provide the level of assurance to account holders that should be expected.

In addition, almost half of the unreconciled $2.4 billion related to transactions involving receipt of funds by the government on behalf of a Tribal account from third parties. An additional half billion dollars of unreconciled transactions involved transfers between different accounts of the same Tribe. With respect to these two categories of transactions, where the receipts or transfers to a particular Tribe's accounts were posted to the general ledger, it is likely that the Tribe had use of the funds even if it they were posted to the wrong account of that Tribe. Deducting these amounts from the $2.4 billion in unreconciled transactions, and based on other supplemental data, we believe the legislative settlement options to address unreconciled transactions should focus on the remaining $575.1 million (excluding interest).

This report reflects a milestone in the federal government's efforts to address these longstanding inadequacies. As described more fully below, the report contains our preliminary proposals for settling the disputed balances in the Tribal trust fund accounts based on the results of the five-year, $21 million reconciliation project. These concepts are provided in accord with the American Indian Trust Fund Management Reform Act of 1994, which provides that the Secretary shall outline efforts he will undertake to resolve disputed Tribal trust fund account balances. In addition, pursuant to the Act, the Special Trustee is making recommendations to implement improvements to trust management policies, practices, procedures and systems Department-wide. Some reforms already have been instituted, including conversion to a core trust accounting and investment system for tribal funds, publication of standardized procedures for the management of IIM accounting operations and reconciling all cash activity on a daily basis for both Tribal and IIM accounts. OTFM has published regulations providing procedures for Tribes to withdraw and manage their own funds should they so

2

0552

choose.  Between 1990 and the present, staffing of the OTFM has been increased five fold.  Finally, the Administration has included in its budgets for 1996 and 1997, and will include in the outyears, funding to implement trust reform efforts.

We believe that legislation ultimately will be required to provide a settlement that will be fair to account holders.  This report contains the Department's specific recommendations for addressing claims based on transactions where documentation indicates that errors were made.  We refer to these as "Type I claims," and we recommend that where errors occurred to the detriment of Tribes, the government reimburse the account with simple interest computed at the Tribal benchmark rate. With respect to the Type 1 claims where errors inured to the benefit of the Tribe, the Department recommends netting those amounts against any amounts owed to the Tribe, and forgiving any remaining amount owed by the Tribe after netting is applied.

Where Tribes have additional documents to contest their account balance (we refer to these as "Type 2 claims"), we recommend that Tribes have an opportunity to present those claims to the Department.  In the event the Department disagrees with the Tribe's position, the Tribe may request that the matter be submitted to a mediator who would be empowered to recommend a resolution of the claim.

There are two additional types of claims for which consultation with Tribes is necessary before we can develop any settlement recommendations.  First, there are claims based on the $2.4 billion of unreconciled transactions, which we refer to as "Type 3 claims."  Although we may be able to locate some documents, it is not possible to determine whether the Tribes suffered money losses as a result of the Bureau of Indian Affair's (BIA) management and accounting practices.  We believe that resolution of these questions by litigation would be time-consuming, expensive and not in the interest of either the government or the Tribes. Accordingly, we are soliciting Tribal input on how best to address these claims in settlement.

Second, some Tribal representatives assert that they are entitled to some form of redress for management and accounting practices involving transactions outside the scope and duration of the 20-year study.  They argue that they will be unable to agree on a final account balance unless these issues are addressed in the settlement process.

3

0552

The report outlines several possible "total" settlement options as a point of departure for our further discussions on these broader claims and the Type 3 claims. While the government does not endorse any of these specific proposals - and those described in this report by no means constitute all of the possible approaches - we nonetheless would like to consider Tribal views with respect to these and other proposals.

Our overriding objective for this settlement process is to achieve fairness and justice with respect to Tribal trust account balances. We are committed to doing the best job we can, recognizing the limitations of what has occurred in the past and the available information, to restore funds to Tribal trust accounts that have suffered losses as a result of inadequacies in the Department's management and accounting systems. The effort must be principled and undertaken in good faith, paying those to whom money is owed, with due regard to fiduciary obligations, while, at the same time, protecting the public fisc where little or no reasonable likelihood of loss exists.

We considered the following objectives in formulating the proposals and options for the proposed legislation:

- achieve a settlement that is fair

- achieve the most resource-efficient settlement of claims (in terms of conserving federal government and Tribal time, money, and staff, including attorneys' and expert witness fees)

- encourage settlement by providing incentives to settle and by providing disincentives to litigation

- use the most informal settlement processes available rather than litigation to encourage Tribal participation

- obtain funding for the settlement without reducing appropriations for the BIA budget and Tribal programs

- achieve final agreement on account balances through September 30, 1995, as required in the Act, as an agreed-upon starting point for the future

4

When the consultation process is complete, the Department will submit a final set of recommendations to Congress. Funding sources also will need to be identified. In order to provide time for consultation with Tribes, we plan to submit those recommendations to Congress in April 1997.

## II. BACKGROUND

### A. Overview

The Secretary of the Interior has the responsibility to ensure the proper accounting, investment and financial reporting of over 300,000 Indian Tribal and individual Indian money (IIM) trust fund accounts. The authority for management of Indian trust funds was delegated to the Assistant Secretary, Indian Affairs, and re-delegated to the BIA. Since February 1996, this authority has been delegated to the Office of the Special Trustee (OST) through the transfer of authority over the Office of Trust Funds Management (OTFM).

The American Indian Trust Fund Management Reform Act of 1994 (the Act) directs the Secretary of the Interior to prepare a report to Congress by May 31, 1996, to include a description of the procedures used for reconciliation of the Tribal trust fund accounts and a statement outlining efforts the Secretary will undertake to resolve disputes regarding Tribal account balances.[1]  The reconciliation was carried out by the Bureau of Indian Affairs (BIA) in an effort called the Tribal Trust Funds Reconciliation Project (the Project). This report identifies for Congress the general approach the Secretary is contemplating for resolving account balance disputes and includes specific recommendations to resolve known errors. The Department will consult with the Tribes by circulating this report to Tribal account holders and seeking their comments on the various approaches to settlement and to the specific questions raised herein.

---

[1] Because most Tribes did not have sufficient time to review their reconciliation reports and inform the Department whether they disputed their account balances (known as "attestation responses") as of the May 31 deadline, the Secretary submitted to Congress an interim report describing the reconciliation procedures on May 31, and set a deadline of September 27, 1996, for submission of attestation responses. With the extension of the deadline for submitting attestation responses, the Secretary indicated that he would submit a supplemental report to Congress, including proposed legislative options to address disputed account balances later in the year.

5

This analysis incorporates many of the settlement recommendations of the Special Trustee's Advisory Board, which was created by Section 306 of the Act (hereinafter the "Advisory Board"). The Advisory Board's settlement proposals were submitted to the Secretary on September 24, 1996, and were the result of a series of consultations between the Special Trustee, his Advisory Board and several Tribes. As requested by the Special Trustee, the Advisory Board's recommendations are appended to this paper. In our recommendations, we describe where we agree and where we disagree with the Advisory Board's recommendations.

## B.  Tribal Accounts Versus Individual Indian Accounts

There are two general types of accounts which are administered by the OST.[2] First, there are Tribal trust fund accounts maintained on behalf of 301 account holders. Second, there are IIM accounts, maintained on behalf of over 300,000 individual Indians. The options outlined in this analysis address approaches for resolving account balances of Tribal accounts only, because Section 304 of the Act requires a report on only those accounts. While this report does not address resolution of IIM account balances, on June 10, 1996, a class action lawsuit, captioned Cobell v. Babbitt, was filed in U.S. District Court on behalf of the IIM account holders. Settlement discussions are proceeding between attorneys for the plaintiffs and the United States to attempt to resolve claims by the IIM account holders. Unlike the Tribal trust accounts, no historical reconciliation of the IIM accounts has been performed because of the inordinately high costs -- estimated in 1992 to be in the $108 million to $281 million range -- of conducting such a reconciliation. The settlement process in the litigation, if successful, may provide a more efficient means of estimating liability, if any.[3] Some components

---

[2]  All Indian trust fund accounts were historically administered by the Bureau of Indian Affairs ("BIA"). In February 1996, the Secretary re-delegated the responsibility for management of Indian trust fund accounts to the Office of the Special Trustee, through the transfer of authority over the Office of Trust Funds Management (OTFM).

[3]  The Advisory Board selected the $281 million amount simply because it was the upper end of an early estimate of Arthur Andersen L.L.P., for undertaking a reconciliation of the IIM accounts similar to the reconciliation already conducted for tribal accounts. The Advisory Board reasoned that rather than spending this sum "to produce what is likely to be an unsatisfactory result," that amount should be "used to compensate IIM account beneficiaries for any harm, damage or loss arising out of the government's inability to provide an accurate and timely accounting to IIM trust account holders." In our view, there is no demonstrable relationship between the "harm, damage or loss" that IIM account holders may have suffered and the cost to produce a reconciliation of the IIM accounts. Moreover, the Advisory Board's recommendations do not make

6

of the Tribal settlement legislation outlined in this report may also be appropriate for settling components of the IIM claims as well at issue in the <u>Cobell</u> litigation.[4]

## C.  Legislation Versus Litigation

We believe that legislation rather than litigation would provide an orderly and efficient mechanism for resolution of the disputes over account balances arising out of the Project.  The proposed legislative approach described here responds to the statutory directive that the Secretary outline efforts to resolve such disputes in his report to Congress.  It would address only those claims arising from the Project, not individual Indian accounts or other funds.  Case-by-case litigation would be wasteful, expensive and time-consuming.  Given the inadequacy of the available records and the historical deficiencies in BIA's accounting and management systems, additional reconciliation efforts that would accompany litigation would, at best, produce only marginally more refined data.  Moreover, some elements of a settlement policy, including forgiveness and offset of claims, might be desirable and legislation could define the parameters of the Department's authority to implement them.  Legislation also could address funding sources for the settlement.

## D.  Past Versus Future

This report addresses options for a legislative resolution of problems from the past -- the Tribal trust fund account balance disputes.  On a separate track, the Secretary and the Congress, through the efforts of the Special Trustee, are evaluating approaches for comprehensive reform of the Department's management of trust systems for the future.  The Special Trustee has completed an assessment of trust management policies, procedures, practices and systems as they apply to both IIM and Tribal accounts.  He has produced a conceptual strategic plan to acquire and institutionalize new trust accounting and management systems.  Through additional analysis and consultation with both Tribal and federal interests,

---

clear how IIM account holders would agree that the payment was in full satisfaction of their individual claims.

[4] The settlement recommendations of the Advisory Board include a proposal for settling IIM accounts which was developed prior to the filing of the <u>Cobell</u> litigation.  The Advisory Board proposed, among other things, a payment of $281 million to be deposited in the IIM Investment Pool and subsequently invested for the benefit of IIM account holders.  The payment would be a permanent fund, generating interest for IIM account holders, and also would serve as a reserve to pay claims successfully brought by individual account holders.

7

the conceptual plan will be transformed into a strategic plan as required by the Act and submitted to Congress.  The President's annual budget requests for the Department include funds earmarked for implementing the Special Trustee's strategic plan.[5]

E.    **Structure of this Report**

Part III of this report describes in detail the Department's role with respect to Tribal and IIM trust funds, deficiencies in the records concerning trust accounts and balances, and the Project which studied Tribal trust fund investment transactions for a 20-year period.

Part IV presents some options for settling Tribal claims based on errors, incomplete documentation or inaccurate accounting of trust funds during the reconciliation period, 1972-1992.[6]  As noted, the Department needs to consult further with Tribes and with others in the Administration to develop an appropriate settlement proposal.  This part of the analysis does not address issues relating to the individual Indian money accounts held by the United States on behalf of individual Indians or Tribal claims outside the scope of the Project.

Part V outlines options for Congress to structure any future litigation concerning Tribal claims based on alleged trust fund losses.  While the idea behind the settlement proposal being developed by the Department is to encourage settlement through means other than litigation, we also envision that it will be necessary to provide those Tribes that choose not to settle a fair process to litigate their claims.

Part VI presents the concept of a "total settlement" that would resolve claims

---

[5]  The Advisory Board proposed $147 million for implementation of the strategic plan as a component of a joint settlement for IIM and Tribal account holders.  This amount is based on preliminary estimates, and includes approximately $20 million in annual operating costs over five years, and $47 million of one-time equipment and infrastructure costs.  The Department proposes to continue to request funding of implementation costs as part of its annual budgets.  The enacted FY 1997 Interior and Related Agencies Appropriations Act included $15,726,000 for implementation of the Special Trustee's strategic plan, including funding for immediate office staffing and the Advisory Board.  Future Departmental requests will be based on the final approved strategic plan being developed by the Special Trustee in 1997.

[6]  There is potential overlap between settlement options for the Tribal claims and the claims in the Cobell litigation.  Certainly, Congress could consider a broader settlement package which addresses both Tribal and IIM claims.

8

beyond the scope and time frame of the Project and any claims that may relate to historical mismanagement of trust assets. Undertaking additional reconciliation efforts or litigating these claims could be particularly expensive. With the Tribes and Congress, and after further consultation within the Administration, we would like to explore possibilities for legislative resolutions that would resolve disputes on behalf of all or virtually all Tribes, and that would provide final account balances for Tribal trust funds as of September 30, 1995.

At this stage, the Department is merely exploring whether a "total settlement" is warranted and whether it would be fair to all concerned. We do not endorse at this time the concept of a "total settlement" or any of the specific alternatives presented for comment. As a result of additional consultation, other ideas could emerge which might produce a more equitable result for all involved. We also have tried to identify important questions about these options; many of these questions do not have obvious or easy answers.

## III. RECONCILIATION EFFORTS FOR TRIBAL TRUST FUND ACCOUNTS

### A. The Project

Over the past decade, operational reviews and financial audits have identified weaknesses in the control and oversight of Indian trust funds. A primary concern was the failure to reconcile the trust fund accounts regularly and to assure that account balances were accurate. Consequently, in 1988, 1989 and 1990, Congress directed BIA to take steps to reconcile Indian trust fund accounts as accurately as possible back to the earliest possible date. The FY 1990 appropriations language further required that "the results of such reconciliation [be] certified by an independent party as the most complete reconciliation of such funds as possible."

Pursuant to these directives, BIA commenced its Project in 1990. In the fall of 1990, an ad hoc Tribal advisory group[7] worked in conjunction with the BIA, the General Accounting Office (GAO) and the Department's Inspector General to develop a request for proposal for the reconciliation contract. In May 1991, the contract was awarded to a national accounting firm, Arthur Andersen, LLP.

---

[7] The ad hoc group constituted itself as the Intertribal Monitoring Association (ITMA).

9

Phase I of the contract was intended to determine what records were available, what procedures would be necessary, and the cost of a complete reconciliation for both Tribal trust and IIM accounts. This work was performed from June 1991 through January 1992. The results of Phase I disclosed that not all supporting documents could be located, but to the extent they could be located, they could be examined, and that some BIA trust policies, procedures, and systems had deficiencies. As a result, it was agreed, through discussions involving the Department, the Office of Management and Budget (OMB), Congress, and the Intertribal Monitoring Association (ITMA), that a conventional financial audit was not likely to produce meaningful results.

In view of this, the Department of the Interior, in consultation with OMB and ITMA, considered alternative methodologies and approaches with the goal of producing as accurate an accounting as practicable. As a result, the BIA modified the Arthur Andersen contract to incorporate the methodological procedures agreed upon by the Department, OMB and Tribal representatives. While the procedures do not constitute an audit in accordance with generally accepted auditing standards, they were deemed to be the best available approach and were therefore used to reconcile the Tribal trust fund accounts for the period July 1, 1972 through September 30, 1992. The year 1972 was selected as the starting point because it coincided with the date on which BIA assumed sole responsibility for Tribal trust fund accounting and recordkeeping to the account level. Prior to that time, the Department of the Treasury had accounts for individual Tribes listed within its systems, although BIA may have reported the amounts to be placed in the accounts (in contrast to the current practice where there is one combined account for all Tribes at Treasury).

In accord with the Congressional mandate that the Tribal trust fund reconciliation be certified by an independent third party, the BIA awarded a contract to perform the certification to Coopers and Lybrand in September 1993. Due to a projected cost that far exceeded available resources, BIA terminated the contract in October 1995, before the certification was completed. At BIA's request, Coopers and Lybrand provided a close-out letter summarizing the work performed prior to termination. In the letter, Coopers stated that it noted errors in certain aspects of Arthur Andersen's reconciliation work under the BIA contract, and that some, but not all, of these errors were reported to Arthur Andersen and BIA. The letter further stated, however, that no conclusions could be drawn from the preliminary information reported because Coopers did not

10

complete the certification work. Arthur Andersen investigated and cleared the reported errors and a record of these activities are on file at Arthur Andersen's office.

In 1994, while the Arthur Andersen reconciliation efforts were ongoing, Congress passed the American Indian Trust Fund Management Reform Act of 1994, 25 U.S.C. §§ 4001-4061, which established the Office of the Special Trustee for American Indians. Under this legislation, the Special Trustee is responsible for oversight, reform, and coordination of the policies, procedures, systems and practices used by various Departmental agencies in managing Indian trust assets.[8] The statute required that the Secretary transmit to Congress by May 31, 1996, a report that describes the methodology and results of the trust fund reconciliation process, includes Tribal attestations as to disputed account balances, and outlines efforts the Secretary will undertake to resolve such disputes. As noted, that report was submitted to Congress with a commitment to provide this supplemental report on the Secretary's recommendations for resolving account balance disputes.

In January 1996, the Department released a report to 301 Tribal trust fund account holders summarizing the results of its Project. The agreed-upon procedures used in the Project were intended to accomplish the following: (1) verify that non-investment financial transactions posted to the BIA's official accounting records are in agreement with supporting financial source documents; (2) assess the accuracy of investment income posted to Tribal accounts; (3) recalculate the U.S. Treasury interest earnings; (4) reconcile general ledger transactions with U.S. Treasury transactions; (5) verify that financial transactions posted to the accounting records are in agreement with the originating lease or sale agreements, permits, or contract terms (not completed for all transactions); and (6) determine the timeliness of the deposit of receipts (for informational purposes only). The Project report indicates that of the $17.7 billion (absolute value)[9] in non-investment transactions, $15.3 billion of transactions were reconciled, while $2.4 billion (absolute value) were unreconciled (that is, as of the time the Project was completed, financial source documents could not be located to support the

---

[8] While Title III of the Act vests this responsibility in the Special Trustee, the Act further provides that the Special Trustee "shall report directly to the Secretary." Section 302(a), 25 U.S.C. § 4042(a).

[9] The absolute value of transactions means disregarding the positive and negative values of the transactions.

11

accuracy of these transactions as entered on BIA's general ledger). For example, the general ledger might show a receipt of $1,000 to a Tribal account in connection with a mineral lease of trust property; however, the underlying documentation necessary to verify its accuracy could not be located. (See pages 21-22 for a more complete description of these unreconciled transactions).

The reconciliation procedures and the proposed adjustments to account balances are detailed in the Project report, and were explained to the Tribes at a national meeting on February 14 and 15 in Albuquerque, New Mexico. More detailed individual consultation was provided to account holders at a series of regional meetings held through July 1996. In August 1996, the Special Trustee sent out a request for all Tribes to submit attestations as to acceptance or dispute of their account balances on or before September 27, 1996.

As of November 1, 1996, the OST received attestation responses from 79 of 301 Tribal trust fund account holders. 33 Tribal account holders accepted the account balances as reflected in the Project, and 46 account holders disputed the balance. 49 account holders requested additional time for their response. 173 account holders filed no attestation response. Among the reasons given by those account holders which disputed their account balances were that the reconciliation procedures were inadequate, that they needed additional time, and that the records were inadequate. Other comments were more specific in nature and did not fall into one of these categories. Some account holders identified more than one reason for disputing their account balances.

Despite five years of effort and the expenditure of $21 million, the Project provides a less than complete accounting of the state of the Tribal trust funds. The inadequacy of the Department's trust management systems, policies, procedures and practices, the condition of the trust records, the fact that a substantial number of documents relating to the 20-year period could not be located as of the time the Project was completed, and funding constraints all contributed to the Department's inability to verify the accuracy of Tribal account balances.

The Project did identify specific errors which resulted in underpayments to Tribal trust fund account holders. These must be corrected and options to do so are outlined below. The Project also uncovered errors which resulted in overpayments to Tribes. Whether and how to recover these amounts is also discussed below. The most difficult issues, however, relate to (1) the unreconciled

transactions where there were no records located to support $2.4 billion of non-investment transactions for the 20-year period of the Project; and (2) those transactions outside the scope and period of time covered by the Project.

### B.    Types of Claims

For purposes of this analysis, the three basic types of potential claims that may arise from the Project results are referred to as Type 1, Type 2, and Type 3 claims:

- Type 1 claims are based on errors specifically identified in the Project for which there was a documented loss to the Tribe or the government. Type 1 claims involve two types of circumstances; either funds are owed by the government to a Tribal account, or the Tribal account was overpaid and it owes funds to the government.

- Type 2 claims are those where a Tribe disputes its account balance from the Project based on additional documentation produced by the Tribe. Because no Tribes responded to a letter sent to them in January 1994, requesting any records in their possession relating to transactions on the general ledger, there may be few Type 2 claims. Nevertheless, there is a need to offer a means for addressing these claims, should they arise.

- Type 3 claims arise from unreconciled transactions, where neither the Tribe nor BIA could locate source documentation to support the account transactions or to support a conclusion that those transactions are in error. This is by far the largest category.

There also are claims arising from transactions that were outside the scope of the Project, or outside the 20-year period covered by the Project. It is impossible to estimate the amount of those claims or to identify the specific Tribe or account to which money may be owed. Should Congress conclude that it wants to address these types of claims, this analysis outlines several different approaches for doing so, in the form of "total settlement" options.

## IV. OPTIONS FOR SETTLEMENT OF SPECIFIC CLAIMS

13